UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X

JOSE LEONIDES VARILLAS BROCA,

        Petitioner,

                                    11 CV 5818 (SJ) (JMA)

      v.

                                  <u>MEMORANDUM<br>AND ORDER</u>

MIRNA MARIANA GIL GIRON,

        Respondent.

--------------------------------------------------X

A P P E A R A N C E S

JONES, DAY, REAVIS & POGUE
222 East 41st Street
New York, NY 10022
By:    Mark R. Seiden
        Caroline Ivie Lents
        Laura W. Sawyer
        Lisa M. Yemm
Attorneys for Petitioner

LANSNER & KUBITSCHEK
325 Broadway
Suite 201
New York, NY 10007
By:    Carolyn A. Kubitschek
Attorney for Respondent

**JOHNSON, Senior District Judge:**

On November 30, 2011, petitioner Jose Leonides Varillas Broca ("Petitioner" or "Varillas") filed a petition pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or the "Convention" or the "Treaty"), implemented in the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610 (the "Petition"). Varillas seeks the return of his two minor children, M.V. and J.V., to Mexico.[1] The children were born in Mexico, are citizens of Mexico, and were raised in Mexico from their birth until approximately July 2010, when their mother, Mirna Mariana Gil Giron ("Respondent" or "Gil"), unilaterally decided to bring them to the United States. On December 9, 2011, pro bono counsel was appointed to represent Gil, and the Court enjoined her from removing the children from the State of New York. On July 20, 2012, the Petition was referred to Magistrate Judge Joan M. Azrack for a Report and Recommendation ("Report").

Judge Azrack conducted a two-day hearing and, on September 25, 2012, issued the Report. In it, she recommends granting the Petition and ordering the children returned to Mexico. Respondent objects to the Report and makes essentially three arguments: (1) that the children are well-settled in their new environment; (2) that there exists a "grave risk" of physical or psychological harm to the children were they to return to Mexico; and (3) that M.V. is sufficiently mature to permit the

---

[1] Varillas has a third child, J.H.V., who is 16 years old and, though named in the Petition, is no longer subject to the Hague Convention because the Convention only applies to children under 16. On May 12, 2012, by stipulation, the Court dismissed the action as to J.H.V.

Court's consideration of her objection to returning to Mexico. It is undisputed that these three arguments represent three affirmative defenses to the Convention.

By and large, the parties do not dispute the facts as set forth in the Report. Therefore, they will not be repeated here in full, and familiarity therewith is assumed. However, because the Court is duty-bound to conduct a _de novo_ review, some facts in the record but not specifically cited in the Report have been added.

Petitioner and Respondent are both citizens of Mexico. They met in the town of Cardenas, in the State of Tabasco, where Petitioner lived and where Respondent often visited her mother. They were married in April of 1995 and have three children. J.H.V. was born on March 7, 1996, M.V. was born on December 3, 1997, and J.V. was born on October 16, 2002. The family lived together in Tabasco in a house close to or on the same property as the homes of Petitioner's brother, sister and mother. Respondent's mother continues to live in the town, although Respondent's father lives in Mexico City, a 12-hour bus ride away.

Around the time of M.V.'s birth, Varillas and Gil's marriage began to deteriorate. Varillas became physically abusive. The incidents were many, upwards of 50, and they included hitting, shoving and punching Gil in the face. One incident occurred when Gil was pregnant, in which Gil claims Varillas tried to kick her in the stomach but Gil was able to turn around in time, and he instead struck her behind. Gil did not officially seek medical treatment, but claimed to consult with a doctor she knew personally, who did not recommend further medical attention.

Varillas was psychologically abusive, to boot. He decided if and when Gil was allowed to work in the family's tortilla business – there were times she was prohibited from working and others when she was forced to. Whether or not Gil worked, Varillas handled the money for the family and distributed to Gil the amount of money he deemed sufficient to buy groceries. During periods of turmoil, Gil would be given less grocery money, apparently out of spite. Neither Gil nor the children were given keys to the home. The front gate would be locked at what Varillas referred to as a "reasonable" hour. On more than one occasion, Gil and/or the children were locked out for failure to come home at a "reasonable" hour.

At some point, Varillas began to suspect that Gil was having an affair. He began an informal investigation, including questioning the children about her whereabouts. In February 2010, on a night when Gil was late returning home, Varillas locked her out of the house, forcing her to climb over the gate and in through the window. When confronted, Gil told Varillas that she'd been running errands and that she had also been at church. Varillas did not believe her. He demanded that she be examined by a physician to determine whether she had recently engaged in sexual activity, which request she rebuffed. A physical struggle ensued and woke the children. Gil fled to her mother's house with M.V. and J.V.

The following Sunday when Varillas, Gil, the children and Gil's mother attended church services, Varillas addressed the congregation. He asked whether anyone had seen Gil at the church on the night she claimed to have been there,

whereupon Gil ran out of the church, crying. That night, Gil again took M.V. and J.V. with her to her mother's house. This time, she remained there for five months. During that time, M.V. and J.V. saw Varillas on weekends, and J.H.V. remained at home with his father. In July of 2010, Gil left the State of Tabasco for Mexico City, taking all three children with her. Varillas was not consulted. Gil spent one night in Mexico City with her father and one or two nights in Monterrey with her grandmother. From there, she arranged for a "coyote"[2] to smuggle her and the children across the border.

Gil's first stop in the United States was her sister Patrizia's home in Texas, where she and the children remained for about one month. They then came to Brooklyn and lived with Gil's other sister, Gabriela ("Gabriela"). Gil, Gabriela and their combined six children lived together in the sister's one-bedroom apartment for approximately one year. Gil found off-the-books work as a waitress and eventually moved out of Gabriela's apartment and rented a room in a two-bedroom apartment. Gil and her children shared one bedroom in that apartment for a year, until a rent increase forced her to return to Gabriela's, where she and the children remain today. The children did not have to change schools as a result of these moves.

At the hearing, several witnesses testified, including M.V., who at that time was 14 years old, but as of this writing, is 15. M.V. testified that she constantly observed her parents fighting and that she, too, had been hit by Varillas. She

---

[2] A "coyote" is an individual who is paid to arrange an illegal border crossing into the United States from Mexico or points south.

described three incidents, including one in which he hit her and almost caused her to fall down a flight of stairs, another in which he hit her on her behind with a broomstick and another in which he hit her with a belt. The most recent of these incidents occurred at least seven years ago.

Judge Azrack found M.V. to be credible, her fluency in English to be impressive given the short two years M.V. had been speaking the language, and found her to be intelligent and well-spoken. M.V. testified that she has friends who speak English and friends who speak Spanish. She visits friends in their homes and invites friends to her home. Four days a week, M.V. attends church for either services, youth group or choir rehearsal. In terms of extended family, she has lived with or near her aunt and cousins since arriving in Brooklyn, and has a great uncle in this district who she sees every week or two. Finally, M.V. receives high marks in school, has a particular aptitude for the sciences and math, and hopes to become a lawyer. Much of M.V.'s social and educational life mirrors the one she enjoyed at home in Mexico, where she lived in close proximity to most of her extended family, performed extremely well in school, and was actively involved in the church.

When asked whether she wanted to return to Mexico, M.V. indicated that she does not. She gave several reasons: she's made friends here, is "more comfortable" here, believes it's easier to become a lawyer here, wants to attend college here and because it's "pretty" here. When asked specifically what about Mexico she did not like, she stated that she did not like that people gossiped about her family's

6

problems. She feared it would continue if she returned. She also feared that she might not achieve her goal of becoming a lawyer were she to return to Mexico. M.V. complained that teachers in Mexico provided less assistance in class than her teachers do here. She claimed that if ordered to return to Mexico, she will do so, but she will not live with her father because she doesn't "want anything to happen again." Thus, she would return to live with Respondent's mother, who also lives in Cardenas.

On cross-examination, M.V. understood that she is in the United States illegally and could be deported. She understood that as a result she would be limited in certain ways (such as having to do off-the-books work—"[w]aitressing, things like that") but she was unaware of certain other limitations (such as being unable to acquire a driver license, be awarded federal financial aid for college, or becoming permanently excludable from the United States if deported). When specifically asked about deportation, she stated, "Until [I get deported], I have to make my life." She was aware that she'd have to "do [her] papers" before her presence in the United State could be legitimized, but knew no details other than that her aunt obtained legal status. She understood that her status currently prevents her from seeing any family in Mexico and that that situation will continue indefinitely if she is not repatriated. This makes her sad.

J.V. did not testify at the hearing. However, the record indicates that he attends school and church regularly and has friends with whom he plays. J.V. has

had difficulty in school, in whole or in part because of the time it has taken him to attain facility with the English language. On February 22, 2013, J.V. was interviewed *in camera* outside of the presence of the parties and counsel.[3] J.V. presented no fluency or comprehensive impediments, and did not avail himself of the interpreter. He informed the Court that he enjoys playing soccer with friends, and recently built snowmen and had snowball fights with friends. He also said that he would be "kind of nervous" if ordered back to Mexico because he doesn't "know that much of Mexico."

At the hearing before Judge Azrack, Dr. Even Stark ("Stark"), an expert witness on the subject of domestic violence, testified that he met with Gil for four hours and with the children for less than an hour each. He testified generally as to the trauma children face when living in a household containing violence, both violence to the children and violence by one parent against the other. Stark did not perform a psychological assessment of the children and admitted that such an assessment would be necessary to determine if they had been traumatized by their father's behavior. Stark believed Gil to be a victim of domestic violence, found M.V. to be fearful, and believed Varillas would be likely to harm M.V. or, indeed, any female who challenged his authority, including Respondent, should she return.

---

[3] See, e.g., de Silva v. Pitts, 481 F.3d 1279, 1287 (10th Cir. 2007) (considering child's *in camera* interview outside of the presence of the parties and counsel); Dalsgaard v. Montoya, No. 11 CV 2204, 2011 WL 5837223, at *1 (M.D. Fla. Oct. 24, 2011) (conduting *in camera* interview with "no lawyers and no parents").

Respondent does not dispute Judge Azrack's finding that Petitioner set forth a prima facie case under the Convention, and those findings are adopted. She does, however, object to the Magistrate's finding that the foregoing evidence failed to establish any of the three affirmative defenses. The Court will address each in turn.

## I.    Grave Risk Exception

To state a valid objection to repatriation under Article 13(b) of the Treaty, Respondent must demonstrate "a grave risk" that returning the children would "expose the child to physical or psychological harm." The grave risk objection must be demonstrated by clear and convincing evidence and "[t]he level of risk and danger required to trigger this exception . . . has consistently been held to be very high." In re Koc, 181 F. Supp 2d. 136, 155 (E.D.N.Y. 2001). To that end, courts must determine whether the children would, once returned, face imminent danger prior to the resolution of the underlying custody dispute. See generally Blondin v. Blondin, 238 F.3d 153, 159-160 (2d Cir. 2001) ("Blondin IV"); see also Elyashiv v. Elyashiv, 353 F. Supp. 2d 394 (E.D.N.Y. 2005) (declining to return children to Israel where petitioner threatened their lives and refused to permit respondent to divorce him, where such permission was required under Rabbinical law). Courts are instructed to develop a "thorough" record to determine whether, in the event of a likelihood of harm, the children can be returned not to the allegedly abusive parent, but to a "suitable third party" in the family's home country, such as the home of a

grandparent. <u>Blondin v. Blondin</u>, 189 F.3d 240, 249 (2d Cir. 1999) ("<u>Blondin II</u>").

In other words, even if a grave risk of harm is established, the children should still be

returned if "adequate guarantees of child protection," can be found in the children's

country. <u>Id.</u> Thus, the exception is a particularly narrow one.

Respondent has failed to meet this standard. While the record is replete with

evidence that her relationship with Petitioner disintegrated amidst physical and

psychological incidents of abuse, there exists little to suggest that the same applies to

the children. True, M.V. testified as to having been hit by her father on three

occasions, but none of those occasions were recent, the last occurring over seven

years ago. None of the incidents required medical attention. These facts alone do

not support a finding that a grave risk of physical harm exists.

There is also no evidence that the children are presently suffering from any

psychiatric infirmity brought about in part or in whole by Petitioner's behavior, or

that upon return to Mexico same can be expected. If credited, Stark's testimony

indicates at best that in the past, M.V. suffered trauma by watching her mother be

hurt by her father and worried that she would experience the same fate, especially

after she herself was hit by him. However, even taking that as true, Stark did not

observe any lasting effects on M.V., and in any event, he spent very little time with

M.V., during which he admittedly could not appropriately assess her psychological

state. Moreover, on the stand, M.V. did not indicate that she was afraid of her father,

only that she doesn't wish to live with him because she doesn't want "anything to

happen again." The record is unclear as to whether "anything" refers to being hit by her father, watching her parents fight, having her father humiliate the family at church, or quite simply anything unpleasant at all. The grave risk exception is a narrow one, and these statements by M.V. (with or without consideration of Stark's testimony) fail to provide clear and convincing support for the theory that she would face severe psychological trauma if repatriated.[4] See, e.g., Blondin IV, 238 F.3d at 161 (finding proof of services available for the family inapposite because "it [did] not purport to cast doubt on the Court's finding that *even with all of these arrangements in place*, the children face an almost certain recurrence of traumatic stress disorder") (emphasis in original).

There is even less support for applying the grave risk exception to J.V., who the parties agree was never physically beaten by Petitioner. During J.V.'s *in camera*

---

[4] There is another argument made by Stark that warrants some, if a bit fleeting, attention. Stark opined that the children would be at risk of psychological harm were they to witness Respondent being abused by Petitioner. As we know, the Convention does not enable the Court to order Respondent's return – only the children's. While Respondent is, at this time, free to change her mind on the subject, the record indicates that she does not plan to move back to Mexico. It then stands to reason that if she is not in Mexico, the risk that the children witness Respondent abusing her is neutralized. Even if she were to return, the evidence indicates that her father's home in Mexico City could provide a safe haven for her and the children until custody is determined. Such an outcome would permit the appropriate authorities to determine the extent to which Petitioner's rights to access to his children should be restored in light of Respondent's allegations of abuse. In this case, however, further investigation into the protections available to Respondent in Mexico is not warranted. If, on the other hand, Respondent decided or became compelled to return to Mexico with the children, the Court would first, per Blondin, take evidence from the appropriate bodies of the contracting states to determine whether the Mexican government could provide assurances as to Respondent's safety. The Court would also permit Petitioner to offer a rebuttal expert on the issue of psychological harm to the children.

interview, he indicated that he has little memory of his life in Mexico, and gave no indication that he recalled witnessing violence in his home.

The Court finds that the exception does not apply to this case, and this portion of the Report is adopted.[5]

II.    Well-Settled Exception

The second exception invoked by Respondent is embodied in Article 12. It permits the denial of a petition in the event that more than one year has elapsed from the date of the wrongful removal if the children have become well-settled in the new environment. This exception must be proved by a preponderance of the evidence. 42 U.S.C. 11603(e)(2)(B). This is a lower standard of proof than the grave risk defense, perhaps to acknowledge that the passage of time in the new environment comes with it a likelihood of developmentally- or psychologically-meaningful attachment. In re Robinson, 983 F. Supp. 1339, 1345 (D. Colo. 1997) ("Prompt action for return seeks to remedy the harm of the original wrongful removal. As time passes, a child becomes increasingly settled or connected to its new environment and delayed return may itself become the second harmful disruption."). However, this exception is not meant to reward the abducting parent who conceals a

---

[5] Respondent attempted to offer evidence that Petitioner physically abused the couple's eldest child, J.H.V., who is no longer a subject of this action. The relationship between Petitioner and J.H.V. could be probative of Petitioner's propensity for violence. However, Respondent did not call J.H.V. as a witness or submit him to psychiatric evaluation.

child. See Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. at 10,494.

The factors that the Court may consider are not in dispute. Courts have examined:

> (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church or participates in other community or extracurricular activities regularly; (6) whether the child has friends or relatives in the new area; and (7) the immigration status of the child and the respondent.

Lozano v. Alvarez, 697 F.3d 41, 57 (2d Cir. 2012). Indeed, these are the same factors weighed by Judge Azrack. The Court will now review those factors de novo.

*Age of the Children*

While the age of the abducted child is a factor to be considered, courts are not in total agreement as to the existence of a correlation between age and degree of settlement. It is possible that a child's tender age could make it easier to recover from repatriation if, for example, the child has little memory of ever having moved in the first place or has made no substantial ties to the new country. See Ramirez v. Buyauskas, 2012 WL 606746, at *17 (E.D. Pa. Feb. 24, 2012) (finding undeterminative the age of a two-year-old child). In another case, a very young child may have lived a life devoid of any stability whatsoever in his or her home country, and the idea of uprooting the child yet again (and after a year or more of settlement)

may, in connection with the other factors, be deemed repugnant to the aims of the Convention. It is altogether a different case in which the child is old enough to form the type of significant attachments to the United States contemplated by the Convention but, for any number of reasons, simply has not. See generally Koc, 181 F. Supp. 2d 136 (E.D.N.Y. 2001); see also Lops v. Lops, 140 F.3d 927, 946 (11th Cir. 1998) (affirming district court's finding that the children were not well-settled in part because they were being concealed from the non-abducting parent and made few local ties). In that case the home country could very well be the situs of the child's social and educational development notwithstanding a year's (or longer) separation therefrom. Conversely, the age of an older child might cut in favor of a finding of settlement if the child has few relatives, friends, and social involvements in his or her home country, and has them here. Additional permutations and slides along the continuum are conceivable, but needn't all be recounted here. What the Court means to illustrate is that it cannot be said that an older child is either less settled or more settled than a younger child. All other things are scarcely equal.

On this issue, Judge Azrack found that M.V. "spent the first twelve years of her life in Mexico, and has only been in the United States for the last two years." (Report at 21.) For the reasons stated above, that M.V. lived in Mexico for a large percentage of her life does not alone suggest that this factor weighs against a finding of settlement. Unlike the cases in which a parent conceals the child and prevents social development, in this case M.V.'s age actually enabled her to be part of society.

14

As to J.V., Judge Azrack found that he "has spent a larger portion of his life here because he is only nine years old . . . [but] he is struggling with English and not doing well in school." (Id. 21.) Given his age, the percentage of time spent in Mexico is again not as probative as the fact that he does not have much memory of living there. He is not too young to make friends and establish bonds here. At the same time, he is not old enough to have meaningful relationships with the friends he has made here, beyond playing, and likely did not have those relationships in Mexico either. For him, age carries little weight in this analysis.

*Stability*

Judge Azrack found that the children have moved four times in the last two years, indicating that the children's environment is unstable. However, what was considered the first move was the trip from Texas to New York. The children were in Texas living with Respondent's sister for approximately one month. This was essentially their point of entry into the United States. While they certainly moved themselves and their belongings from Texas to New York, the stay in Texas appears more akin to a sojourn or stopover on the way to New York, much like their stopovers in Mexico City and Monterrey, albeit longer. Moreover, it occurred during the summer months when school was not in session. The Court is cognizant of the significance of the remaining moves, less so of the number of moves (as the children remained in the same community and lived in only two places, one of which is with

15

family) but because Respondent has yet to establish a home of her own for the children. They first lived (and currently live) with Respondent's sister and her three children in a one-bedroom apartment, and, presumably when it became affordable, moved into a two-bedroom apartment. However, in that apartment, Respondent and the children shared the apartment with another woman, and had only one bedroom to themselves. These living situations do not suggest the "security, stability and permanence" required to meet the well-settled exception, which, like all the exceptions to the Convention, is a narrow one. Lozano, 697 F.3d 41, 56 (quoting In re N., 1990 1 FLR 413 (Eng. High Court of Justice, Fam. Div.) available at www.hcch.net/incadat/fullcase/0106.htm (last visited March 6, 2013)). Therefore, this factor weighs against both M.V. and J.V.

*School and Community Activities*

It is undisputed that the children have consistently attended school and church in the same community since their arrival to New York. The church provides M.V. with additional social ties to her community: she attends church four days per week and participates in a youth group and choir. Therefore, as to church attendance, this factor favors both children. Both children also have excellent school attendance. M.V. has performed exceptionally well in school, with accolades in science and math and admission to a specialized high school program where she will further those aptitudes. Although J.V. spoke intelligibly and without need for an

16

interpreter, the evidence indicates that, as recent as June 2012, language has been an impediment to his classwork. Therefore, his school and community activities will be considered in light of his history of language difficulties, and given less weight than that afforded to his sister.

*Friends and Relatives*

The children's extended family consist of their aunt and cousins, with whom they live, and a great uncle, who they visit regularly. In terms of friends, the record reflects that both children have friends with whom they socialize outside of school and entertain at home. M.V. testified to having "many" friends, and Respondent testified that J.V. has friends with whom he regularly plays. J.V. corroborated that testimony at his *in camera* interview, wherein he represented that he plays soccer and has built snowmen and engaged in snowball fights with friends and family.

*Immigration Status*

Respondent, M.V. and J.V. illegally entered the United States and remain here illegally. The Report correctly points out that immigration status is a non-dispositive factor for the Court's consideration. <u>Lozano</u>, 697 F.3d at 49. (soliciting the opinion of the United States Department of State and, based thereon, concluding same). However, <u>Lozano</u> determined that "rather than considering the weight to be given to a child's immigration status in the abstract, courts . . . must simultaneously

balance factors which . . . may not support the same determination." Id., at 57-8; but see Koc, 181 F. Supp. 2d at 154 (finding not well-settled a child whose abducting parent was unemployed where the child, inter alia, attended three schools and lived in three homes in less than three years, was in the country illegally, and made few friends).


*Balancing of Factors*

In light of the foregoing, the Court finds that the totality of factors support a finding that Respondent has established by a preponderance of the evidence that M.V. is well-settled. The only factors against such a finding are her immigration status and lack of stability of residence. There is little doubt that the latter is a result of the former – her mother's illegal status limits employment opportunities and has thus far thwarted attempts to secure a home of their own. However, M.V.'s performance in school, rapid acquisition of English proficiency, involvement in church, establishment of friends and a social life suggest "significant connections to the new country." Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. at 10,509 (1985).

While the argument that J.V. is well-settled is admittedly weaker, on account of his school performance, the Court nevertheless finds it sufficiently persuasive. Like his sister, J.V. has established that he has friends and family in Brooklyn with whom he is close, attends church and has essentially no memory of similar ties to

Mexico, having left at the age of 7. The Court credits his report card from the fourth grade, which demonstrates the difficulties he has had in school. However, as stated, supra, he spoke English well and did not require use of the interpreter during his *in camera* interview. The Court is in no position to contradict the findings of his fourth grade teacher (and does not), but it does not appear that he still experiences the same problems with fluency and comprehension as he did in June 2012.

Moreover, to the extent that the well-settled exception is intended to account for the likelihood that an international relocation is disruptive to a child's development, it cannot be disputed that a significant disruption would occur if J.V. is separated from his siblings, his mother, and the only life he knows.

It is unclear whether Petitioner, in pursuing the return of J.V. notwithstanding both M.V.'s satisfaction of an affirmative defense and J.H.V.'s exemption from the Treaty, has considered the effect such a result would have on a young child, if not all of the children. See, e.g., Blondin v. Blondin, 78 F. Supp. 2d 283, 291 (S.D.N.Y. 2000) (declining to separate children because "children's relationships with their siblings are the sort of intimate human relationships that are afforded a substantial measure of sanctuary from unjustified interference by the State.") (quoting Aristotle P. v. Johnson, 721 F. Supp. 1002, 1005–06 (N.D. Ill. 1989); and citing Roberts v. United States Jaycees, 468 U.S. 609, 618 (1984); and In re Rodriguez, 33 F. Supp. 2d 456, 462 n.7 (D. Md. 1999); (internal quotation marks omitted)).

The allegory of the Judgment of Solomon is one that comes to mind, and this Court thinks it wiser, and more congruent with the aim of this affirmative defense, to avoid "cutting the baby in half." 1 Kings 3:16-28. Therefore, the Court is disinclined to further fracture the family unit.

## III. Mature Child Exception

Respondent also argues that M.V. is sufficiently mature such that her objection to returning to Mexico be afforded sufficient weight to prevent her repatriation. The Court agrees.

It is undisputed that the Treaty applies to children under 16, and that M.V. is 15 years old. However, Article 13 also permits a court to refuse to order the return of a child where the child objects to being returned and has achieved an age and degree of maturity at which it is appropriate to consider her views. Article 13. No particular age automatically confers maturity on a child. In this regard, the leading authority on the Treaty is instructive:

> [T]he Convention also provides that the child's views concerning the essential question of its return or retention may be conclusive, provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account. In this way, the Convention gives children the possibility of interpreting their own interests. . . . [I]t would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will. Moreover, as regards this particular point, all efforts to agree on a minimum age at which the views of the child could be taken into account failed, since all the ages suggested seemed artificial, even arbitrary. It seemed best to leave the application of this clause to the discretion of the competent authorities.

Elisa Pérez-Vera, Explanatory Report on the 1980 Hague Child Abduction Convention, Acts and Documents of the 14th Session, ¶ 30 (1982) (emphasis added). Here, Judge Azrack found that M.V. is not mature for the following reasons: (1) she expressed a "generalized desire" to remain in the United States because of the luxuries of living in New York City; (2) she feared only that her neighbors in Mexico would gossip about her family and that she would not become a lawyer; (3) she likes the United States because "it's pretty;" and (4) she did not understand the implication of her immigration status.

However, a review of M.V.'s testimony indicates that she prefers to remain in the United States not only on account of superficial concerns, but also that she has particularized, mature objections to returning to Mexico. See, e.g., Falk v. Sinclair, 692 F. Supp. 2d 147, 165 (D. Me. 2010) (distinguishing between a preference for remaining in the United States and an objection to returning to one's home country). She personally witnessed her parents fighting and testified at the hearing that she does not want to live with her father anymore. M.V. also stated that her teachers here are more helpful and instructive than those in Mexico.

The Court considers it a sign of M.V.'s maturity that she testified she fully intends to comply if her return to Mexico is ordered. M.V. also understood that her immigration status will be a problem for her. She testified that she knows that certain opportunities will be limited, specifically employment opportunities, and she

21

also understood that she needs to figure out a way to remove these barriers. When asked her thoughts on the possibility of deportation, she responded: "until that happens, I have to make my life." Petitioner is correct that there were specific aspects of M.V.'s illegal status of which she was unaware, including, inter alia, the price of attending a private university, her inability to obtain government funding for college, the range of means of obtaining legal status and the likelihood of becoming permanently excludable if deported. While M.V. might not be particularly knowledgeable about the nitty-gritty of the immigration laws – and few 15-year-olds are – she is not ignorant of the fact that she is in the United States somewhat precariously and may be forced to leave before she has the opportunity to legitimize her presence. That she has balanced the risks and rewards of her status in this fashion displays a level of maturity that ought to be considered. See Leites v. Mendiburu, No. 04 CV 2004, 2008 WL 114954, at *6 (M.D. Fla. Jan. 9, 2008) (refusing to order the return of a 13-year-old who experienced arguing in her home in Argentina, enjoyed school, friends and sports in the United States, and believed she could avail herself of more opportunities here); see also Kofler v. Kofler, No. 07 CV 5040, 2007 WL 2081712, at *9-10 (W.D. Ark. Jul. 18, 2007); Diaz Arboleda v. Arenas, 311 F. Supp. 2d 336, 344 (E.D.N.Y. 2004). For these reasons, the Court finds that M.V. is mature enough to have her objection to repatriation honored.

IV. *Additional Evidence*

The Court's decision is based on the submissions of the parties, the transcript of the hearing before Judge Azrack, and the *in camera* interview with J.V., who was not present at that hearing. However, no weight was afforded to subsequently-filed declarations or to *amicus curiae* filings.

## CONCLUSION

For the foregoing reasons, the Report is adopted in part and set aside in part and the Petition is denied. The Court's December 9, 2011 order enjoining the children from leaving the State of New York is vacated. The Clerk of the Court is directed to close the case.

SO ORDERED.

/s/(SJ)

Dated: March 6, 2013
Brooklyn, New York

Sterling Johnson, Jr., U.S.D.J.